**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **ANITA HARRIS,** ) | **CASE NO. 1:13CV2797** |
| ) | |
| **Plaintiff,** ) | **JUDGE BENITA Y. PEARSON** |
| ) | |
| v. ) | **Magistrate Judge George J. Limbert** |
| ) | |
| **CAROLYN W. COLVIN**[1]**,** ) | **REPORT AND RECOMMENDATION** |
| **ACTING COMMISSIONER OF** ) | **OF MAGISTRATE JUDGE** |
| **SOCIAL SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

Anita Harris ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and remand the instant case for proper evaluation, application and analysis of the opinions of treating psychiatrist Dr. Vazquez.

**I.   PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for benefits on September 15, 2010 alleging disability beginning on January 1, 2003. ECF Dkt. #13 ("Tr.") at 306-311. The SSA denied Plaintiff's applications initially and on reconsideration. *Id*. at 235-240. Plaintiff requested an administrative hearing, and on July 19, 2012, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 153-190, 251. On September 14, 2012, the ALJ issued a Decision denying benefits. *Id*. at 133-147. Plaintiff requested review of the Decision, and on December 3, 2013, the Appeals Council denied the request for review. *Id*. at 1-4, 428.

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

On December 19, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On April 16, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #16. On May 16, 2014, Defendant filed a brief on the merits. ECF Dkt. #18.

**II.     SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-eight years of age at the time of filing her applications, suffered from chronic low back pain and neck pain, chronic obstructive pulmonary disease, major depressive disorder, recurrent, severe with psychosis, and mixed personality disorder, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c). Tr. at 135. The ALJ characterized Plaintiff's impairments of headaches, glaucoma, kidney disease, vertigo, diverticulosis, and schizoaffective disorder as non-severe impairments. *Id*. at 135-136. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526 ("Listings"). *Id*. at 137-139.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: no concentrated exposure to temperature extremes, humidity, strong odors, fumes, dusts, chemicals, or other respiratory irritants; and simple, routine and repetitive tasks. Tr. at 139. The ALJ ultimately concluded that, although Plaintiff could not return to her past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of a counter attendant, hand package inspector, and a marker. *Id*. at 146. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

>    3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));
>
>    4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));
>
>    5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice'

within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V.     RELEVANT MEDICAL HISTORY AND TESTIMONY**

Since Plaintiff's only challenge before this Court is that the ALJ failed to properly evaluate the opinions of her treating psychiatrist, the undersigned's review of the medical evidence is confined to Plaintiff's mental health history.

**A.     Mental Health History**

While Plaintiff alleged her onset date as January 1, 2003, she begins review of her mental health history in her brief with the September 8, 2009 initial psychiatric evaluation performed by Dr. Vazquez. ECF Dkt. #16 at 3, citing Tr. at 460-466.

On September 8, 2009, Dr. Vazquez, a psychiatrist at Connections Health, Wellness, Advocacy ("Connections") evaluated Plaintiff and noted that she had been to outpatient counseling for two years at the age of 23 for depression, but she reported that it did not help and she stopped going when her doctor left that practice. Tr. at 460. Plaintiff reported being a victim of violence and stated that she left school when she was in twelfth grade because she was pregnant. *Id*. at 462. She indicated that she was caring for four grandchildren, one of whom had a severe psychiatric problem, and her daughter had a schizophrenic disorder and wanted to move in with her as well. *Id*. at 462-463. Dr. Vazquez noted that Plaintiff was well-groomed, had average eye contact, clear speech, and no delusions, but she reported auditory hallucinations. *Id*. at 462. He further noted that Plaintiff began treating with her primary care physician Dr. Katz in 2006 after her father died at the age of 100 and Dr. Katz prescribed Cymbalta for her depression but it made her auditory hallucinations worse. *Id*. at 460. She also took Wellbutrin XL which made her less depressed but caused her to have poor sleep and fluctuating weight and did not help her auditory hallucinations. *Id*. at 464. Dr. Vazquez noted that Plaintiff had a depressed mood, a constricted affect and had average intelligence, and he diagnosed her with severe, recurrent, major depression with psychosis,

-4-

and mixed personality disorder. *Id.* at 464. He rated her global assessment of functioning at 55, which indicates moderate impairment. *Id.* He prescribed Risperdal and continued her Wellbutrin. *Id.* at 466.

On February 24, 2010, Plaintiff met with a Connections social worker/certified nurse practitioner for medication management. Tr. at 459. It was noted that Plaintiff had not been to Connections since her initial visit with Dr. Vazquez. *Id.* Plaintiff stated that she spread out the medications that Dr. Vazquez had prescribed. *Id.* at 458. She reported that she was still hearing voices and was hearing something that sounded like radio reception. *Id.* She also indicated that she saw shadows. *Id.* The nurse practitioner found that Plaintiff had a logical thought process, an appropriate affect, cooperative behavior, and no suicidal or homicidal ideations. *Id.* She recommended continuing Plaintiff's medications. *Id.*

On March 4, 2010, Plaintiff's social worker/certified nurse practitioner noted that Plaintiff had been unable to obtain her medications because of the cost. Tr. at 456. After the nurse spoke with the pharmacist, Plaintiff could now obtain her medications with a $3 co-payment from Medicaid. *Id.*

On March 24, 2010, Plaintiff met with her Connections social worker/certified nurse practitioner for medication management and support. Tr. at 455. She reported that she had a bad day the day prior as her neighbor who was drunk pulled a knife on her. *Id.* at 454. She also indicated that her mother was in the hospital and her grandson was in trouble at school. *Id.* The social worker found that Plaintiff had logical thought processes, but she reported hearing voices and was anxious and upset. *Id.* The nurse recommended increasing Plaintiff's Risperdal. *Id.* at 459.

On April 21, 2010, Plaintiff met with her social worker/certified nurse practitioner at Connections and reported that she had a crisis with her grandchildren as they were acting out and she was angry and had to call to ask for help. Tr. at 452. Notes indicate that the grandsons were diagnosed with attention deficit hyperactivity disorder, bipolar disorder and opposition defiance disorder. *Id.* Plaintiff stated that she was hoping to hold out until the summer when they would go with her daughter, the mother of the boys, who was schizophrenic. *Id.* Plaintiff's thought processes were described as logical, and her insight/judgment were good as she took steps to try to prevent a

-5-

crisis by calling someone. *Id.* Plaintiff's medications were continued and she was given a phone number for a mobile crisis unit. *Id.* at 453.

On May 20, 2010, Plaintiff met with a certified nurse practitioner/social worker at Connections and she reported that one of her grandsons was in a detention home and she needed to get help for him. Tr. at 450. She also reported problems with her younger grandson and concerns about her mother, who needed a kidney. *Id.* She was anxious and talkative and she reported that she was still hearing voices and seeing things. *Id.* The nurse indicated that Plaintiff was anxious, cooperative and had good insight/judgment, but was complaining about the voices. *Id.* She recommended adding Depakote and continuing Plaintiff's other medications of Wellbutrin XL, Risperdal and Buspar. *Id.* at 451.

June 17, 2010 progress notes from Connections indicate that Plaintiff reported feeling very anxious as she had to go to court for her oldest grandson and she had lots of other stressors due to helping her mother and caring for her grandchildren. Tr. at 448. Plaintiff reported sleeping problems, vomiting and losing weight, which she attributed to anxiety over her grandchildren and not to the medications. *Id.* The counselor found that Plaintiff had a logical thought process, but she reported hearing voices and seeing shadows. *Id.* Plaintiff indicated that her mood was better on the prescribed medications and the nurse found that her behavior was within normal limits, with good insight/judgment. *Id.* She continued Plaintiff's medications. *Id.* at 449.

On July 29, 2010, progress notes from Connections show that Plaintiff was well-groomed, with clear thought process and logical thought content, normal perception and a flexible affect, and no suicidal or homicidal ideations. Tr. at 446. Dr. Vazquez noted that Plaintiff was in a worried mood and reported crying a lot and could not stop because she may lose her Medicaid benefits, one of her grandsons had hit her and she was trying to obtain a placement for him, the other grandson was attending anger management, and her daughter who was schizophrenic was going to come in December to get the grandsons, who were staying with Plaintiff. *Id.* Dr. Vazquez adjusted Plaintiff's medications. *Id.* at 447.

The next note from Dr. Vazquez is on October 28, 2010, where Plaintiff presented and reported that she was no longer crying as much and her sleep was fair. Tr. at 532. Dr. Vazquez

-6-

referred Plaintiff for counseling and adjusted her medications. *Id*. at 533.

On November 16, 2010, Dr. Rivera reviewed the medical evidence of record concerning Plaintiff's mental health impairments and considered Listings 12.02 for organic mental disorders, 12.04 for affective disorders, and 12.08 for personality disorders. Tr. at 204-205. He concluded that insufficient evidence existed as to the establishment of any claim from the alleged onset date of January 1, 2003 through the date last insured of December 31, 2007. *Id*. at 204. For years after that time period, he opined that Plaintiff's mental impairments were not severe as she had mild restrictions in daily living activities, maintaining social functioning and in maintaining concentration, persistence and pace. *Id*. at 204.

A January 27, 2011 note from Connections indicated that Plaintiff reported continuing anger problems due to her grandson. Tr. at 841. She stated that the Depakote was helping at night and her grandson would be leaving in one month. *Id.* Dr. Vazquez increased her Depakote. *Id.* at 842.

On March 1, 2011, Dr. Vazquez completed a mental residual functional capacity ("MRFC") assessment. Tr. at 678. He found that Plaintiff had moderate limitation in her abilities to: remember locations and work-like procedures; understand, remember and execute very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. *Id.* He further opined that Plaintiff was markedly limited in her abilities to: understand, remember and execute detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; travel in

unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. *Id*.

In the accompanying Section B of the MRFC assessment form that requested that Dr. Vazquez insert or attach his mental status exam for Plaintiff, he wrote that she was alert and tense, with a sad mood and restricted affect, her thinking was logical, she was well-oriented, she had a patchy memory and she was not suicidal. Tr. at 679.

On April 26, 2011, Dr. Vazquez met with Plaintiff for medication management. Tr. at 837. Plaintiff reported that she was feeling a little better and was staying by herself, but did not feel safe where she was living. *Id*. Dr. Vazquez continued Plaintiff's medications. *Id*. at 838.

On June 21, 2011, Dr. Vazquez completed a psychological questionnaire regarding Plaintiff, indicating that he first examined Plaintiff on September 8, 2009 and he followed up with her every four to eight weeks for twenty minutes. Tr. at 674. He indicated her diagnoses of severe, recurrent major depression with psychotic features and mixed personality disorder. *Id*. He stated her symptoms as depression, auditory hallucinations, irritability, agitation and severe anger episodes, crying episodes, difficulty concentrating, and withdrawn behavior. *Id.* He noted that medications have helped very little and Plaintiff had not been consistent in attending counseling. *Id.* As to Plaintiff's ability to sustain an eight-hour workday and five day workweek, Dr. Vazquez stated "I don't think she can interact with people in a work environment even part time because of her depression and conflicts with people around her. " *Id.* He commented that Plaintiff's ability to get along with others is poor because of her irritability which he believed would increase under the stress of work-related demands. *Id*. at 675. He opined that any kind of stress causes Plaintiff to either become more depressed and withdrawn or to have intense anger. *Id*. He further concluded that Plaintiff would be unable to even sustain a part-time job due to her inability to have appropriate attendance. *Id*.

On July 26, 2011, notes from Connections indicate that Plaintiff came in for medication management and support and reported that her daughter and grandchildren moved to Cleveland but had been harassing her and she was behind in her rent. Tr. at 833. However, she reported that she was sleeping well and the increased Depakote was helping her mood and had no side effects. *Id*.

-8-

On September 6, 2011, Dr. Vazquez saw Plaintiff for medication management and support and Plaintiff reported that her daughter and grandchildren were not bothering her and she was subsequently doing better. Tr. at 831. She stated that her sleep was poor. *Id*. Dr. Vazquez increased Plaintiff's Risperdal. *Id*. at 862.

On October 18, 2011, Plaintiff saw Dr. Vazquez to obtain help completing social security papers. Tr. at 829. He noted that Plaintiff no longer had the paper that he had given her advising her not to have anyone stay with her. *Id*. He indicated that he would write another one. *Id*.

Plaintiff met with Dr. Vazquez on February 21, 2012 and reported that she had not been sleeping well as her daughter was having a lot of problems and she was helping her with her children. Tr. at 825. She also indicated that her ex-husband was getting released from prison and she was afraid that he would try to control her or hurt her. *Id*. Dr. Vazquez wrote her a note which stated that she could not have anyone live with her. *Id.* Plaintiff reported that she was still having auditory and visual hallucinations but did not want to change her medications as she felt good and was not crying as much and felt like she had control of her life. *Id.* Plaintiff stated that she would like to move to a safer area and would like to return to counseling when she was able to receive Medicaid again. *Id.*

March 27, 2012 progress notes from Connections show that Plaintiff reported that she was experiencing numerous problems as she lost her phone line, her gas and electric were going to be shut off due to nonpayment and she would have to go to court because she had not been able to pay her portion of the Section 8 housing. Tr. at 823. Plaintiff also reported that her daughter was arrested for assault and the four grandchildren were on their own, so she was trying to help and custody issues were being investigated. *Id*.

On June 21, 2012, Dr. Vazquez saw Plaintiff for medication management. Tr. at 847. She reported that she had gone to court about one of her grandsons and she appropriately refused to take care of him so he was going to be sent to live with his father. *Id*. Her daughter continued to drink alcohol with her psychiatric medication, and Plaintiff had not solved her inability to pay her rent and utilities. *Id*. She was assigned a new case worker and was going to start pain management but was

-9-

unable to afford the Celexa that her doctor had prescribed. *Id*. Dr. Vazquez noted that Plaintiff continued to be withdrawn, sad and angry. *Id.*

On June 28, 2012, Dr. Vazquez completed a physician questionnaire concerning Plaintiff's psychiatric impairments. Tr. at 843. He listed Plaintiff's diagnoses as schizoaffective disorder and mixed personality disorder. *Id.* He identified her symptoms as depression, anxiety and hallucinations, exaggerated anger reactions, poor sleep, crying, being isolated, poor concentration, and being suspicious. *Id*. He explained that they have tried several medications and they only helped a little as Plaintiff continued to decompensate under added stress. *Id*.

When asked to comment on Plaintiff's ability to sustain an eight-hour workday five days per week, Dr. Vazquez answered that Plaintiff was barely able to take care of herself as she is late to appointments or misses them, she is irritable and has many interpersonal conflicts and withdraws in order to avoid them. Tr. at 843. He also noted that Plaintiff has poor concentration, low energy and poor sleep. *Id*. Dr. Vazquez opined that Plaintiff would not be able to handle any added stress without decompensating, even with a part-time job. *Id*. He further opined that Plaintiff experienced symptoms severe enough to interfere with the attention and concentration necessary to perform simple tasks at least fifty percent of the time on most days. *Id*. at 844. As to getting along with co-workers, supervisors and the general public, Dr. Vazquez indicated that Plaintiff is irritable and suspicious and would have a lot of conflict with small provocation. *Id.* In commenting on Plaintiff's ability to respond appropriately to work pressures in an usual work setting, including decision-making, attendance and maintaining a schedule, Dr. Vazquez opined that Plaintiff decompensates under additional stress, is not good at keeping appointments, and has difficulty solving problems in her own life. *Id*. He stated, "I don't see her ever being able to keep a job." *Id*.

### B.     Hearing testimony

At the hearing, Plaintiff testified that she completed high school and the last job that she had was in 2002 as a nursing assistant for a couple of months. Tr. at 160. She had a prior job for a number of years at a window products store where she made windows and storm doors but then she started to have breathing problems and her back started hurting. *Id*. at 172. She also had self employment cleaning houses in 2002 and worked in a nursing home. *Id*. at 173-174.

Plaintiff explained that she was thereafter awarded custody of her four grandchildren for which she received benefits from the State and she had to take three of the four grandchildren for mental health services when she had custody of them. Tr. at 174-176. She reported that she filed for disability benefits in 2010 primarily because of her back problems, her headaches and her glaucoma. *Id*. at 178. She reported that she still occasionally smoked cigarettes. *Id*.

Plaintiff related that in addition to her physical problems, mental issues prevented her from working because she could not remember things, she lacks patience, she blurts things out, and she has a lot of anger. Tr. at 161. She also stated that she has trouble getting along with people and stays inside her home. *Id*. at 162. She indicated that she just got assigned a social worker from Connections that is teaching her how to cope with people and is helping her to obtain her medications. *Id.* She lives by herself and does not participate in any social activities . *Id.* at 163. She spends a typical day watching television and can perform household activities, like cooking and cleaning, but she uses the microwave a lot. *Id*. at 169. She testified that she has about 10 good days per month and when she has bad days, she stays in her house in the dark and shreds papers with a shredder. *Id.* at 170. She explained that she shreds papers because she does not want people to look at her mail. *Id.* She stated that she has a whole room of papers to shred and she shreds until she gets tired. *Id*. She also indicated that she does not want people to go through her garbage so she throws the shredded papers in the garbage and waits until the morning that the garbage truck comes and takes her garbage out at that time. *Id*. at 171.

Plaintiff stated that she had tried to take online classes in child development for a couple of months to help her understand her grandchildren better, but she got frustrated and stopped. Tr. at 181-182. She indicated that she was taking Risperdal and other mood stabilizers such as Depakote, and she was given a new medication but it made her have suicidal thoughts so she had to go to the emergency room. *Id.* at 184.

The VE then testified. Tr. at 185. The ALJ presented a hypothetical individual of a person who was the same age, education and work experience as Plaintiff, with a RFC for light work but with no concentrated exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals or other respiratory irritants. *Id.* at 185-186. The ALJ asked if such a hypothetical person

-11-

could perform Plaintiff's past relevant work and the VE testified that such a person could not perform Plaintiff's past work as a window maker, but could feasibly perform her past work as a house cleaner. *Id*. at 186.  The ALJ then added a restriction to simple, routine and repetitive tasks to his first hypothetical individual and the VE testified that such a person could perform housecleaning and could also perform other jobs existing in significant numbers in the national economy, including the representative occupations of counter attendant, hand package inspector, or a marker in retail trades.  *Id*. at 186-187.

## VI.    LAW AND ANALYSIS

Plaintiff advances only one argument before this Court.  She asserts that the ALJ violated the treating physician rule by failing to adequately explain the weight that he gave to the opinions of her treating psychiatrist, Dr. Vazquez.  ECF Dkt. #16 at 9-13.  For the following reasons, the undersigned recommends that the Court find merit to Plaintiff's assertion.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.  A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

-12-

medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377.

In addressing the opinion evidence concerning Plaintiff's mental impairments, the ALJ noted that while she alleged an onset date of 2003, the record did not reflect that Plaintiff received mental health treatment until her initial assessment with Dr. Vazquez in September of 2009. Tr. at 143. Thus, the undersigned recommends that the Court find that Plaintiff is not entitled to social security benefits from her onset date through September of 2009 as no evidence in the record supports a

-13-

contrary finding and Plaintiff began her analysis in the instant case with Dr. Vazquez's initial assessment of September 2009.

As to Dr. Vazquez's opinions, the ALJ cited to them in the section of his decision addressing opinion evidence and he noted some of the specific statements that Dr. Vazquez made concerning Plaintiff's inability to work even on a part-time basis. Tr. at 144-145. However, in deciding to attribute less than controlling weight to Dr. Vazquez's opinions, the ALJ merely stated in this section that the determination of a claimant's RFC and her ability to work are issues reserved to him as the ALJ. Tr. at 145. He thereafter summarily concludes that Dr. Vazquez's opinions are not entitled to controlling weight but he would give them some weight to the extent that they were consistent with the record as a whole. *Id*. The undersigned recommends that the Court find that this alone is insufficient to fulfill the requirements of the treating physician rule as the ALJ fails to provide "good reasons" for his determination.

Moreover, even reviewing the ALJ's decision in its entirety for compliance with the treating physician rule leads the undersigned to recommend that the Court find that the ALJ failed to fulfill its requirements. The ALJ does not address the medically acceptable clinical and laboratory diagnostic technique prong of the treating physician analysis, but he does cite to the fact that Plaintiff could care for her four grandchildren. Tr. at 143. The ALJ stated that Plaintiff's ability to care for her grandchildren established that her mental impairments were not disabling. *Id*. He also stated that Plaintiff "mental impairments are largely situational" and "one would expect to see increased mental health treatment or possibly even episodes of decompensation due to the situational stressors." *Id*. at 143. He further cited Plaintiff's testimony that she is living alone and "records indicate some improvement" as a result of her living alone. *Id*.

Beyond his own non-medically trained speculation as to the fluctuation of Plaintiff's mental health conditions and the reasons for the fluctuations, the ALJ failed to address the fact that Dr. Vazquez, Plaintiff's treating psychiatrist who spoke with her at each of her sessions and discussed Plaintiff's family stressors and other issues, did not find that Plaintiff's mental impairments were

-14-

situational or find that when Plaintiff lived alone, her mental impairment symptoms improved sufficiently to enable her to sustain full-time employment.

The ALJ also cites to Plaintiff's testimony that she attempted to take an online child development class as evidence that Plaintiff could get along with others and believed that she could work at a job. Tr. at 144. However, Plaintiff testified that she signed up for the online classes to try to gain a better understanding of the issues facing her four grandchildren so that she could help them and she took the online class from home. *Id.* at 181. She further testified that she attended the class on and off for two months but she quit because she became frustrated. *Id.* at 180. Such evidence does not support compliance with the treating physician rule. The ALJ cited to Plaintiff's abilities to cook, do the laundry and housework and to drive and shop as evidence that Plaintiff is not severely limited. *Id.* at 143. However, Plaintiff testified that she goes to the grocery store only at night and she cooks by using the microwave a lot. *Id.* at 169.

In her brief, Defendant cites to portions of progress notes from Dr. Katz, Plaintiff's primary care physician, for support of the ALJ's discounting of Dr. Vazquez's opinions. ECF Dkt. #18 at 16-17. However, the ALJ's focus on the secondary notations of a general practitioner over the opinions of a treating psychiatrist does not constitute good reason for attributing less than controlling weight to Dr. Vazquez's opinions. Defendant also cites to progress notes from Dr. Katz and Connections showing that at times, Plaintiff reported she was not crying as much, she felt like she had control over her life, and she was having good results with her medications. Tr. at 142. However, Plaintiff testified that she had ten good days per month where she can eat, clean up and even go over to her sister's house. *Id.* at 169. She testified that on bad days, she stays in her house in the dark and shreds papers all day until she gets tired. *Id.* at 170. Dr. Vazquez opined that Plaintiff experienced symptoms severe enough to interfere with the attention and concentration necessary to perform simple tasks at least fifty percent of the time on most days. *Id.* at 844. He further noted that several medications have been tried, but they have only helped a little and Plaintiff continued "to decompensate under added stress." *Id.* at 845. Thus, while the medications may help to some degree and on some days, Dr. Vazquez's opinion was that overall, Plaintiff mental

-15-

health impairments and symptoms limit her ability to work on a full-time or even a part-time basis as any added stressors in her life would result in the exacerbation of her symptoms. The ALJ's decision does not adequately address why he found Dr. Vazquez's opinions entitled to less than controlling weight.

A violation of the good reasons rule can be "harmless error" if "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) ... even though he has not complied with the terms of the regulation." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir.2010) (quoting *Wilson*, 378 F.3d at 547). The undersigned recommends that the Court find that the ALJ's violation of the good reasons rule is not harmless. Dr. Vazquez's opinions are not patently deficient as the ALJ partly relied upon them in his identification of her impairments. Further, the ALJ did not adopt Dr. Vazquez's MRFC assessment. In addition, the goal of § 1527(d)(2) was not met as the ALJ's decision fails to explain why the ALJ credited Dr. Vasquez's diagnoses but not his mental limitations for Plaintiff.

It may be true that the ALJ will reach the same conclusion on remand after he complies with the treating physician rule. However, the ALJ did not provide the proper analysis to explain why he afforded Dr. Vazquez's opinions less than controlling weight. Upon remand, Plaintiff "will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached." Cole, 661 F.3d at 940. However, to affirm the decision "...would afford the Commissioner the ability [to] violate the regulation[s] with impunity and render the protections promised therein illusory." *Wilson*, 378 F.3d at 546.

Consequently, the undersigned recommends that the Court find that the ALJ violated the treating physician rule as to Dr. Vazquez's opinions.

-16-

### **VII. CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case for proper evaluation, articulation and analysis of the treating physician rule as to Dr. Vazquez's opinions.

DATE: February 2, 2015

                 */s/George J. Limbert*
                 GEORGE J. LIMBERT
                 UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).